# UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

**In re:**

**JANICE E. CUNNINGHAM,**                                    **Case No. 04-76672-DHA**

   **Debtor.**                                    **Chapter 11**

---

## MEMORANDUM OPINION AND ORDER

---

  This matter is before the Court on a creditor's Motion for Partial Distribution from Settlement Proceeds, Claim of Scott B. Rebby ("Rebby") and Motion to Set an Evidentiary Hearing on the matter. This Court must determine whether Rebby is entitled to any monetary compensation for damages he claims the debtor wilfully and deliberately caused to the personal and real property previously in the custody and control of the debtor, which was subsequently sold to Rebby in settlement of his litigation with the debtor.[1] More specifically, the Court must decide whether Rebby proved the debtor committed acts of sabotage to 268 Huntsman Road between the dates of March 30, 2005, and April 4, 2005, the dates not covered by the parties' mutual release.

---

[1] The Court approved that settlement by entry of an order on March 30, 2005 ("March 30 Order").

This is a core proceeding over which this Court has jurisdiction under 28 U.S.C. §§ 157(b)(2) and 1334(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  After taking the matter under advisement, we make the following Findings of Fact and Conclusions of Law.

## I.  FINDINGS OF FACT

On November 12, 2004, the debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code.  In her schedules filed on December 6, 2004, the debtor listed her interests in four pieces of real property as assets of the estate.  These properties are 268 Huntsman Road, Norfolk, Virginia, 5216 Riverwood Road, Norfolk, Virginia, 3513 Byrn Brae Drive, Virginia Beach, Virginia, and a one-half interest in 132 Old Greenbrier Road, Chesapeake, Virginia (collectively known as "the Properties").  She also listed Scott Rebby ("Rebby") as a creditor for notice purposes only.

On January 25, 2005, Rebby filed an Adversary Proceeding against the debtor to recover the Properties and various other personal property items from the estate.  On March 10, 2005, Rebby filed a Proof of Claim as an unsecured creditor in the amount of $15,000.00 for the "unlawful use, taking [and] conversion of funds [and] property."  Rebby's Proof of Claim.

Finally, on March 30, 2005, after several highly contentious hearings, miraculously the parties settled their dispute and an order was entered approving the settlement agreement ("Agreement"), which was in the form of a transcribed record of the settlement conference.[2]  The Agreement states that in exchange for $379,000 and a Jaguar vehicle, the debtor was to transfer

---

[2] This form of the settlement was accepted by the Court because the parties could not agree on the actual phrasing of the settlement terms.  The Court should have taken this as a sign that the hostilities between the parties were anything but extinguished, and as a sign of things to come.

title of all the Properties, a Ford F-350 Pickup truck, a Caterpillar loader and a pontoon boat to

Rebby.  At closing Rebby was to pay any outstanding institutional liens on the Properties and the

debtor was to pay any non-institutional liens.  The parties agreed to a walk-through inspection of

the Properties on the day of closing to ensure that no sabotage[3] of the property took place prior to

the transfer.  The Agreement also called for mutual releases by the parties, such that any action

that could have been brought by either party against the other on the day of the transcript, March

3, 2005, was permanently waived.

　　　The spirit of compromise faltered when the time came to distribute the proceeds of the

sale of the real estate, and on May 12, 2005, Rebby objected to the debtor's Motion for Full

Distribution of the Proceeds, and requested instead a partial distribution.  Rebby claimed that the

debtor had damaged or allowed the Huntsman Road property to become damaged and that he, as

the buyer, should be compensated.  He requested that $75,000 of the proceeds be held in escrow

for such compensation.

　　　On May 19, 2005, in a hearing on the distribution issue the Court ruled that $75,000.00 of

the settlement proceeds should be held in escrow pending a hearing on damages, which the Court

set for June 22, 2005.

　　　On May 24, 2005, the Court entered an order finding that the date of the mutual release

extended to the date of the actual closing, which occurred on March 30, 2005.  Due to logistics,

the debtor could not vacate the 268 Huntsman property until April 4, 2005; therefore, the Court

ruled that Rebby's damages claim would be limited to sabotage by the debtor that Rebby could

prove occurred between March 30, 2005 and April 4, 2005.

---

[3] A term inserted into the Agreement by counsel for the debtor.

On June 22 and 23, 2005, with two highly competent and determined counsel involved, the parties engaged in a two day trial on the issue of Rebby's damages, that was remarkable for its insignificance in the overall scheme of things between the debtor and the plaintiff.  The following, *inter alia*, was proven by Rebby at trial:

1)      as of March 30, 2005, one of the kitchen drawers at the Byrn Brae rental property was damaged,

2)      as of March 30, 2005, the water was cut off at the Byrn Brae property,

3)      as of March 30, 2005, the hot water in the kitchen faucet at the Riverwood Road property did not work,

4)      as of March 30, 2005, the oven door at the Riverwood Road property was broken,

5)      as of March 30, 2005, the dining room light fixture at the Riverwood Road property was missing,

6)      as of March 30, 2005, a ceiling fan and light fixture at the Riverwood Road property did not work,

7)      as of March 30, 2005, the front light fixture at the Riverwood Road property did not work,

8)      as of March 30, 2005, the light over the kitchen sink at the Riverwood Road property did not work,

9)      as of March 30, 2005, the central air conditioning at the Riverwood Road did not work,

10)     between the dates of April 5, 2005 and April 18, 2005, $366.04 was spent on materials and repairs to the irrigation system at the Huntsman Road property, the receipt of which states "due to freeze,"

11)     between the dates of April 19, 2005 and April 20, 2005, $995.50 was spent to repair a water/sewer line leak at the Huntsman Road property, the receipt of which states "found leaking at compression coupling,"

12)      as of April 12, 2005, four electrostatic air filters were missing from the returns in the HVAC system and would cost $2,380.00 to replace,

13)      on June 4, 2005, Rebby purchased a transmitter for a boat lift at the cost of $158.00,

14)      as of April 14, 2005, the purchase price of a PhoneLink 50 Telephone Entry System from Gate-Opener.com was $895.00,

15)      as of April 14, 2005, the combined purchase price of a PRO-SW4000 Gate Operator (master) and a PRO-SW4200 Gate Operator (slave) from ContractorTools.com was $1,578.00,

16)      on May 11, 2005, Rebby purchased a Magnetron, upper rack(s), lower rack(s), and a meat probe for a microwave oven at a total cost of $495.70,

17)      as of April 28, 2005, the cost of treadmill comparable to Rebby's current one, Model # 9076SA was $884.98 (including installation),

18)      as of June 21, 2005, the cost of a "lat bar" for a Bowflex was $60.00 (including shipping), the cost of a "Power Pro bundle" was $49.95, and the cost for an "Ultimate 2 Ab Crunch" attachment was $169.00,

19)      on February 13, 2004, Rebby paid $209.00 to have a neon "Utica Club" sign cleaned and repaired,

20)      on April 11, 2005, Rebby paid $26.64 to Sears Home Central Parts and Repair Center for an ignitor, knob and shipping and handling,

21)      as of June 21, 2005, the cost of a Tritonics remote replacement was $59.69 plus approximately $10.95 for shipping,

22)      on April 17, 2005, a Rainier Comforter Set and a Stand Mixer were purchased from Bed Bath & Beyond at a total cost of $650.98,

23)      on April 4, 2005, light bulbs were purchased from Lowes at a total cost of $99.82,

24)      on April 4, 2005, 5 locks and 8 keys were purchased from Eastern Lock & Key Co. at a total cost of $301.09,

25)      as of June 22, 2005, the cost of a Kodak – CX7530 Digital Camera from an unidentified source was $249.99,

26)     that the price quote of American Diversified Systems Corp. to make repairs at
268 Huntsman Road was $4,639.00.  The stated repairs were as follows:  the
weather stripping on the front door, replace one rheostat, repair railing on
landing, replace window shade in room over the garage, repair six holes in the
wall, furnish and program 4 remotes for garage doors, supply and install one
Sony tuner, repair toilet in master bathroom, furnish and install 32 window
cranks, furnish and install 6 hand blown globes, furnish and install 4 utensil
holders, furnish and install 4 infrared FM repeaters in the master bedroom, and
furnish and install 6 smoke detectors,

27)     on January 24, 2004, an electric fuse was replaced at 268 Huntsman Road at a
total cost of $115.50,

28)     on February 10, 2004, Rebby purchased a 36 count package of Act II popcorn,
and

29)     on May 4, 2000, Cunningham sold an unrelated piece of real property to Ping
Wong.

At the trial's conclusion, the Court was advised that the parties amazingly wanted to have

the proceeding transcribed so that each side could prepare proposed Findings of Fact and

Conclusions of Law.  Therefore, at the parties' request, the Court reluctantly set the date of

August 20, 2005 for the submission of those proposed Findings and Conclusions, and set final

argument on August 25, 2005.

On July 11, 2005, the Court entered an order authorizing the payment of all the

legitimate, uncontested unsecured creditors in this case.

In further costly proceedings, the parties attempted mediation of their differences in

September, having notified the Court that they had not had the June proceedings transcribed.

The mediation attempt was futile, and all semblance of sanity escaped the parties at the time they

attempted mediation.  The best description of the antics between the parties and counsel can be

gleaned from the debtor's objection she submitted to the fee application filed by her counsel in

December, 2005. In the interim, counsel for Rebby was put in an untenable position by his client, causing his withdrawal from that representation.

Rebby appeared at a status hearing on November 29, 2005, claiming he had retained counsel from Washington, DC; however, upon inquiry by the Court he could not remember the name of the individual attorney or his firm, thereby causing further delay and expense in the matter for all concerned.

At the next status hearing, the hearing on the fee application of counsel for the debtor and a motion to make an additional partial distribution of funds to the debtor held on December 13, 2005, Rebby not surprisingly appeared without counsel and advised the Court he was proceeding *pro se*. The Court then took the damages issue under advisement and ruled upon the fee application and the issue of the partial distribution of funds to the debtor. While this opinion does not deal with the fee application, a quick perusal of it highlights the shocking waste of time and money involved in this case. The debtor has incurred almost $200,000 in attorneys' fees, and Rebby presumably likewise incurred very substantial fees pressing his principles in the case.

## II. CONCLUSIONS OF LAW

Breach of contract is a state law claim. In such a claim, it is a well-established rule that the plaintiff seeking damages due to the breach has the burden to prove the breach by a preponderance of the evidence. *Carley Capital Group v. Newport News,* 709 F. Supp. 1387, 1396 (E.D. Va. 1989), *see Taylor v. Flair Prop. Assoc.,* 248 Va. 410, 415 (1994). Preponderance of the evidence simply means "the greater weight of the evidence." *Sawyer v. Comerci*, 264 Va. 68, 75 (2002).

*Black's Law Dictionary* defines sabotage as "wilful destruction or injury of, or defective production of, war material or national-defense material . . . [or] wilful and malicious destruction of employer's property during a labor dispute or interference with his normal operations." *Black's Law Dictionary* 1335 (6th ed. 1990).  This definition has expanded in common usage and is often used to describe "an[y] act or process tending to hamper or hurt[, or] deliberate subversion." *Webster's Ninth New Collegiate Dictionary* 1034 (1989).

The previous findings and rulings of this Court are the law of the case.  *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 815-816 (1988).  "At its simplest, this well-established doctrine essentially provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  *U.S. v. Lentz*, 384 F. Supp. 2d 934, 938 (E.D. Va. 2005) (quoting *Christianson*, 486 U.S. at 815-816). These well-established rules were specifically "'developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.'"  *In re Hoffman Associates, Inc.*, 194 B.R. 943, 951 (Bankr. D.S.C. 1995) (quoting *Dorsey v. Continental Cas. Co.*, 730 F.2d 675, 678 (11th Cir. 1984)).  When the appellate court "has issued no opinion and formulated no legal conclusions on the issue" then the ruling of the lower court becomes the law of the case. *R.M.S. Titanic Inc.  v. The Wrecked and Abandoned Vessel*, 9 F. Supp. 2d 624, 636-37 (E.D. Va. 1998) (citing *Illinois v. Illinois Cent. R.R. Co.*, 184 U.S. 77, 91, 46 L. Ed. 440, 22 S. Ct. 300 (1902); *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 68-69 (4th Cir. 1988), *cert. denied*, 498 U.S. 810, (1990); *Dodd v. Union Indem. Co.*, 32 F.2d 512 (4th Cir.), *cert. denied*, 280 U.S. 581, 74 L. Ed. 631, 50 S. Ct. 33 (1929)).

As stated above, this Court issued a previous order finding that the parties mutually released each other from any claims either had against the other as of the date of the closing on the properties, March 30, 2005.  That same order also limited Rebby's damages to acts of sabotage at the hands of Cunningham.  Given this ruling, which is the law of the case as it was not appealed, it was Rebby's burden to prove such acts occurred between March 30, 2005, and April 4, 2005, the date on which Cunningham left the Huntsman property.

This case is an example of the waste that results when two people make unreasonable demands, based on principle alone.  While the parties did admirably settle the major economic differences between them, they insisted on stubbornly fighting over trivia to the end that both became losers and accrued substantially higher costs than necessary.  When hundreds of thousands of dollars were initially at stake, the parties doggedly fought over items involving a few dollars.  A general review of the items of concern left for the Court to determine in the case is exemplary of the foolish level to which this case has devolved.  The items of alleged "sabotage" at the hands of the debtor involve, *inter alia*:

1) the removal of some of Rebby's personal items from the detached garage at  268 Huntsman Road, which was under his control at all times,

2) alleged damage to "pavers" which in reality are bricks forming the driveway at the residence, which are meant to be driven on and which were not completely installed by Rebby long before the period of March 30 to April 4, when in fact they could have been properly and completely installed,

3) normal wear and tear to the plumbing, sprinkler and electrical systems that may well have resulted from the lack of proper maintenance of those systems by Rebby himself, which is certainly the only explanation for the disrepair of the electric front gate at the premises,

4) miscellaneous items of grave importance, such as keys, remote controls for various systems, oven and storage racks, air conditioning system filters and window cranks,

5)  unexplained and not unusual wear and tear to a pontoon boat and its lift, both of
which were left exposed to the weather by Rebby himself,

6)  front door weather stripping deterioration that is the result of normal wear and tear,
and

7)  Damage to furniture placed and stored by Rebby, himself, in the attached garage,
because it was not properly protected from the elements or vermin.

Rebby presented a mountain of evidence for repair and replacement costs for all of the

above items and more, but he did not prove when the damage occurred or who was responsible

for it.  More specifically, Rebby did not prove that the debtor's actions caused any of the

damage, but rather asks this Court to assume that the damage must have been caused by the

debtor.  Even if the Court was to make that assumption, which it will not, Rebby did not prove

that the damage was caused between the dates of March 30, 2005 and April 4, 2005, as required

by the Court's prior ruling.  Not one of Rebby's witnesses could attest to the condition of any of

the items he sought damages for on the date of March 30, 2005; rather, they could only testify as

to the condition when they saw it some time after April 4, 2005.  The fact that the items needed

repairing or replacing does nothing to prove who damaged them or when they were damaged.

The only damage Rebby did prove the debtor caused were the holes in the walls of the

entry foyer and the living room due to the removal of the security system the debtor had

installed.  In fact, the debtor offered to give the system to Rebby, who refused the offer, so she

had it rather inartfully removed, leaving small holes in the drywall; however, this Court finds

that damage does not rise to the level of sabotage, as defined above.  There were not gaping

holes in the walls, but rather, according to Rebby's own witness, dime- to quarter-sized ones,

exactly the size holes one might expect when security system panels are removed.  That damage,

together with the normal marks made by movers removing furniture from a house totals the damages suffered by Rebby.  None of the damages are the result of sabotage or proven deliberate acts on the part of the debtor, and therefore, Rebby is not entitled to recover anything from the debtor.

While the Court is not impressed with the caliber of either party's credibility given all that has transpired in this case, the Court cannot ignore the fact that Rebby failed to carry his burden of proof on the damages claim.

## CONCLUSION

We have determined that the following resolution of the issues presented is appropriate under the facts of this case and the law as applied to those facts:

1. Rebby did not meet his burden of proof and, therefore, his Objection to a Full Distribution of Proceeds is **OVERRULED**.

2. All remaining proceeds from the sale of property according the parties' Settlement Agreement should be distributed to the debtor forthwith.

**IT IS SO ORDERED.**

Norfolk, Virginia
January 26, 2006

_____
DAVID H. ADAMS
United States Bankruptcy Judge

Copies to:
     Paul K. Campsen, Esq.
     Janice E. Cunningham
     Scott Rebby, Pro Se